UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:25-cr-00144-KDB-SCR |
| | ) | |
| v. | ) | FACTUAL BASIS |
| | ) | |
| CRYSTAL JACKSON | ) | |
| a/k/a Crystal Maticia Jackson | ) | |
| | ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

### The Defendant and Related Persons and Entities

1. Crystal Jackson (JACKSON), who held herself out as a licensed clinical addiction specialist, was a resident of Charlotte, North Carolina and the owner manager of Jackson Consulting Services, LLC (JCS). JACKSON registered JCS as a mental health agency, clinical laboratory and consulting business with the North Carolina Secretary of State. The registered address for JCS was the same as JACKSON'S residence.

## Healthcare Fraud Scheme

2. Beginning no later than January 3, 2020 and continuing through at least June 7, 2024, JACKSON and others operated a Medicaid fraud scheme in Mecklenburg County, in the Western District of North Carolina and elsewhere. As part of the scheme, JACKSON direct billed the North Carolina Medicaid Program (NC Medicaid) over $1.9 million and was paid out over $1.6 million. Also, as part of the scheme, JACKSON submitted, and caused to be submitted, fraudulent claims for drug testing and psychotherapy, which were not medically necessary and often were never actually provided. For example, more than a dozen of the NC Medicaid beneficiaries for which JACKSON billed were incarcerated and at least four were deceased at the time the alleged services were provided.

3. As part of the scheme, JACKSON and her associates transferred, possessed, and used, and caused others to transfer, possess and use, the means of identification of NC Medicaid beneficiaries, to wit: their names, addresses, dates of birth, and NC Medicaid beneficiary numbers of actual persons in whose names they submitted fraudulent NC Medicaid claims.

4. As part of the scheme, after JACKSON and her associates obtained the means of identification of NC Medicaid beneficiaries, they direct billed NC Medicaid for services not rendered to these individuals.

5. As part of the scheme, JACKSON and her associates input medically unnecessary drug testing claims into NC Medicaid's claims processing systems using NC Medicaid beneficiaries' names and means of identification.

6. As part of the scheme, JACKSON and her associates input fraudulent claims for psychotherapy when services were not provided using NC Medicaid beneficiaries' names and means of identification.

7. As part of the scheme, billing under JCS, JACKSON and her associates operated a fraudulent lab licensed under the Clinical Laboratory Improvement Amendments (CLIA) in order to bill NC Medicaid for the highest payable drug testing which required CLIA certification. CLIA certification was required for all labs.

8. The drug-testing and psychotherapy claims submitted to NC Medicaid in this scheme were fraudulent because, among other reasons, they were not medically necessary and the NC Medicaid beneficiaries in whose names the claims were submitted often did not even provide the specimens tested. For example, more than a dozen of these beneficiaries were incarcerated or deceased at the time the alleged services were provided.

9. For example, on or about the dates listed below, JACKSON submitted or caused to be submitted false and fraudulent claims to NC Medicaid for the payment of Psychotherapy and/or Urine Drug Testing purportedly provided to the NC beneficiaries listed below, as stated in JACKSON and JCS's claims:

2

| Medicaid Beneficiary | Claimed Dates of Service | Approximate Dates False Claims Submitted | Number of Claims Submitted and Paid by NC Medicaid |
|---|---|---|---|
| RCG | 5/4/2021 through 12/29/2023 | 8/6/2021 through 12/29/2023 | 32 |
| EDW | 12/13/2020 through 10/5/2022 | 12/3/2021 through 10/14/2022 | 97 |
| AMP | 6/1/2021 through 10/7/2022 | 4/22/2022 through 10/28/2022 | 7 |
| BAD | 6/2/2021 through 1/14/2022 | 1/14/2022 | 18 |

10. NC Medicaid was a state-administered health care program funded, in part, by federal funds that provided health coverage to eligible low-income adults, children, pregnant women, and people with disabilities, among others. NC Medicaid operated, in relevant part, as follows:

   a. NC Medicaid helped pay for reasonable and medically necessary services for qualifying, enrolled individuals and their families, referred to herein as "beneficiaries." Covered services included outpatient behavioral health services, such as psychotherapy, and urine drug testing as part of substance abuse treatment.

   b. The NC Medicaid Program was administered by the Division of Health Benefits, North Carolina Department of Health and Human Services (referred to herein as "DHB," formerly known as the Division of Medical Assistance "DMA"), which oversaw mental health providers through the state who received payments from NC Medicaid. The NC Medicaid Program and DHB, are collectively referenced herein as "NC Medicaid."

   c. If qualified, an individual could enroll as a NC Medicaid beneficiary. At the time of enrollment, a beneficiary received a unique alphanumeric code issued by the program, known as a NC Medicaid identification number. Beneficiaries used their NC Medicaid identification numbers to receive covered services.

   d. Beneficiaries received services from medical practitioners (referred to herein as "rendering providers") and companies (referred to herein as "billing providers").

3

        Once a rendering provider or billing provider enrolled with NC Medicaid, the program issued a unique number to the provider, known as the "provider number." Rendering providers and billing providers were required to obtain a federal identification number, known as a National Provider Identifier or "NPI" number. All NC Medicaid rendering providers and billing providers had to certify that they would only bill Medicaid for medically necessary services they actually performed.

e. For a provider to obtain reimbursement, the provider must have submitted a claim to Medicaid with information relating to the service. Generally, this information included the provider's name, provider address, provider number, patient name, Medicaid Identification Number, NPI number of both the provider and the licensed professional, date of service, nature of the service rendered, and date of billing. The nature of the service rendered was usually submitted by providing the Current Procedural Terminology (CPT) code. The American Medical Association created and maintained CPT codes. For direct billings to NC Medicaid, claims for services were electronically transmitted through a program known as "NC Tracks."

f. Outpatient behavioral health services included psychiatric and comprehensive clinical assessment, medication management, individual, group, and family therapies, psychotherapy for crisis and psychological testing for eligible beneficiaries. Outpatient behavioral health services must have begun with an initial assessment.

g. In order for outpatient behavioral health services to be reimbursed, a recipient must have received a current diagnosis reflecting the need for treatment as defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM) and/or for substance use disorders, meeting the required levels outlined by the American Society of Addiction Medicine (ASAM) criteria. All covered services must have been medically necessary for meeting the specific needs of the recipient. The diagnosis and services provided must have been documented and signed by the authorizing professional and have indicated the date on which the service was ordered. Backdating of service orders was not allowed.

h. In order for a urine drug test to be covered by NC Medicaid, a provider laboratory was required to submit the rendering provider's NPI number, the NC Medicaid recipient's identifier number, dates of service, procedure code, and diagnosis code, among other information.

i. The DMA Drug Testing Policy in place at the relevant times provided, in pertinent part, that:

    i. NC Medicaid covers up to 24 presumptive tests and 24 definitive drug tests per calendar year for each beneficiary;

    ii. A presumptive drug test is medically necessary when it is deemed appropriate by a medical professional as part of the evaluation and

4

     management of a beneficiary who presents with any one of a list of physical symptoms that may indicate drug use;

   iii. Drug tests for NC Medicaid beneficiaries diagnosed with a substance use disorder must be performed at random intervals to properly manage and monitor the beneficiary's care; and

   iv. The reasons and drug testing frequency must be documented in the beneficiary's health record.

11. NC Medicaid was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

## Transactional Money Laundering

12. Beginning no later than February 14, 2023 through March 2, 2023, JACKSON and others executed a scheme to utilize the criminal proceeds from their healthcare fraud scheme to make personal financial transactions in Mecklenburg County, in the Western District of North Carolina and elsewhere.

13. For example, JACKSON knew that she had received approximately $20,917.44 in NCDHHS remittances from fraudulent NC Medicaid claims on February 14, 2023, which payments were deposited into a bank account in the name of JCS which was under her control.

14. On February 15, 2023 through February 17, 2023, JACKSON transferred $19,000 from JCS's bank accounts into her personal account through four different transactions. Then, on February 17, 2023, JACKSON transferred $17,900 to the personal account of Individual #1, knowing that the funds in the account were derived from the scheme to defraud NC Medicaid. That same day, a transfer in the amount of $17,800 was sent from the personal account of Individual #1 to Carvana.

15. The bank accounts in the name of Jackson Consulting Services, JACKSON and Individual # 1's bank account were held by a federally insured bank with branches throughout the United States.

16. JACKSON knew that the funds she transferred on February 17, 2023, represented the proceeds of some form of unlawful activity.

17. At all times, JACKSON acted intentionally, knowingly and willfully and not by accident or mistake.

18. JACKSON'S fraudulent scheme involved an actual loss of more than $1,000,000 involving a government healthcare program.

5

19. JACKSON'S fraudulent scheme involved billing more than ten Medicaid recipients' NC Medicaid beneficiary numbers.

20. In carrying out her fraudulent scheme, JACKSON abused her position of trust as a licensed clinical social worker associate and as a provider eligible to bill NC Medicaid.

RUSS FERGUSON
UNITED STATES ATTORNEY

*[signature]*

Kristina Fleisch
Special Assistant United States Attorney

### Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Information, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

*[signature]* DATED: 6-16-25

Isaac Cordero, Attorney for Defendant